UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

STEVEN DUNIPHAN,              )
                             )
        Plaintiff,            )
                             )
    vs.                       )        Case No. 2:14-CV-51 (CEJ)
                             )
CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security, )
                             )
        Defendant.            )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On April 17, 2011, plaintiff Steven Duniphan filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of December 1, 2008.[1] (Tr. 198-201, 202-08). After plaintiff's applications were denied on initial consideration (Tr. 100-06, 107-13), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 114-16).

Plaintiff and counsel appeared for a hearing on March 21, 2013.[2] (Tr. 34-77). The ALJ issued a decision denying plaintiff's applications on April 25, 2013. (Tr. 7-

---

[1]Plaintiff previously filed applications for benefits under Title II and Title XVI on April 30, 2009, alleging disability based on high blood pressure, depression, anxiety, back problems and an inability to deal with society or people. The applications were denied by the agency and plaintiff did not request a hearing by an ALJ. See Tr. 10.

[2]On November 15, 2012, plaintiff appeared before the ALJ without an attorney. The ALJ granted a postponement of the hearing so that he could obtain counsel. (Tr. 78-85).

33). The Appeals Council denied review on March 6, 2014. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In August 2011, plaintiff listed his disabling conditions as stomach/esophagus problems, frequent vomiting, depression, two ruptured discs in neck, back fusion, blood in stool, inability to deal with society, and high blood pressure. (Tr. 278-85). On December 10, 2012, plaintiff listed his medications as Naproxen, Lisinopril, Citalopram, Tramadol, Trazadone, Buspar, and aspirin. (Tr. 336). An updated report submitted on February 4, 2013, listed Lisinopril, Metoprol, Celexa, Buspar, Trazadone, aspirin, and Ibuprofen. (Tr. 351).

### B. Testimony at Hearing

At the time of the March 2013 hearing, plaintiff lived with his parents. (Tr. 51). He had two adult sons, and a 14-year old daughter and a 10-year-old son who lived with his ex-wife. (Tr. 59). Plaintiff's father helped him pay his monthly child support obligation of $310 and he had recently completed paperwork to modify the payment amount. (Tr. 59). He had Medicaid coverage for his medical needs. (Tr. 63).

Plaintiff testified he completed a 15-month term of imprisonment in October 2012.[3] (Tr. 55, 58-59). He stated that he had a "full lay-in" while he was in prison due to his mental health issues and pain in his neck and shoulders. (Tr. 56). He obtained his GED while he was in prison. (Tr. 64).

---

[3]This was plaintiff's third term of incarceration since 2008.

Plaintiff testified that he was last employed in 2006. (Tr. 39). He had been working as a landscaper for about two years at that time and stopped because he "ran out of work." Since 2006, he had worked sporadically but he did not keep jobs for long because he found it difficult to be around too many people. When asked why he believed he would not be able to work full time, plaintiff identified seizures, problems with his neck and back, and his poor memory. (Tr. 40).

Plaintiff testified that he had his first seizure in October 2012.[4] (Tr. 40). The seizures occurred about once a month and without warning. He said his doctors called them "sight seizures" or "staring spells." (Tr. 41). He had no awareness during a seizure until he woke up in the hospital. After a seizure, it typically took two days for him to feel normal again. (Tr. 42). He testified that he was scheduled to see a neurologist about a month after the hearing (Tr. 41). In the meantime, he was prescribed 900 mg of Neurontin to control the seizures. (Tr. 62-63). In November 2012, plaintiff experienced severe chest pain after a seizure. (Tr. 62). He was hospitalized and it was determined that his chest pains were not cardiac in origin. (Tr. 61).

Shortly before the hearing, plaintiff underwent carpal tunnel and nerve decompression surgery in his left wrist and elbow to address numbness and tingling from his shoulder to his fingers. He anticipated having the same procedures done for his right arm. (Tr. 42-43). He also expected to have surgery on his cervical spine to address ruptured discs and spurs on his vertebrae. (Tr. 46). About three days a week, the pain in his neck was so severe that he had to lie down. Injections had not helped, but Vicodin and warm baths eased the pain. (Tr. 45). He also had

---

[4]Plaintiff initially testified that he did not have any seizures until after his release from prison, but later stated that he did have one seizure while he was incarcerated. (Tr. 55, 61).

stabbing pain between his shoulders and grinding pain in his shoulders. (Tr. 51, 56). He had been advised to avoid lifting more than 10 pounds and felt pain when lifting a bag of sugar. (Tr. 51). He could sit for an hour before he needed to stand up and move around and experienced dizziness when he stood for 30 minutes. He was unable to do household chores or yard work.

Plaintiff had experienced depression and anxiety for the prior two years. (Tr. 46-47). He testified that, with the exception of his new girlfriend and father, he did not like to be around anyone. He felt nervous and "closed in" when around other people, and felt as though others were out to get him. He frequently walked out of the grocery store if the checkout lines were too long. He no longer had many friends. (Tr. 46-48). Stress increased his anxiety. (Tr. 49). Psychotropic medications and talking with his psychiatrist provided some relief, but he still experienced symptoms about three days a week. On those days, he avoided other people. (Tr. 67).

Plaintiff had a history of drug and alcohol abuse. He stated that he became sober in 2008 and had not had any relapses.[5] He attended an AA meeting on Sundays, even though he sometimes felt that the other attendees were talking about him or going against him. (Tr. 54).

Plaintiff testified that he had trouble with his memory. (Tr. 49). He needed reminders to take his medications and keep his appointments. He also had difficulty with focus and concentration, explaining that he "gets off track" when he tried to do something or read. (Tr. 50). He read the Bible and AA literature. (Tr. 50, 66). He did not watch television because he did not want to know what was going on in the

---

[5]Contrary to plaintiff's testimony, in November 2012 he reported that he had consumed a 6-pack of beer in a single evening. (Tr. 728).

outside world, and he was unfamiliar with computers and the Internet. (Tr. 50, 65). He spent his days trying to read and talking to his children on the phone. His 23-year-old son visited frequently and took him for rides. (Tr. 52). He was considering attending a church that he liked but he was not sure he wanted to be around other people. He was not allowed to drive because of the seizures.

The ALJ asked vocational expert Suzanne Hullender, M. Ed., L.P.C., to address plaintiff's vocational history and identify the exertional levels of his past work.[6] (Tr. 68-70). Ms. Hullender testified that plaintiff's past work as a landscaper, if performed fulltime for three years or more, was classified as heavy work. His prior work as a horticultural worker was classified as heavy work; construction work was classified as heavy work; and bakery work was classified as light work.

Ms. Hullender also testified about the employment opportunities for a hypothetical person of plaintiff's age, with the same level of education, training and past work experience. (Tr. 121-22). In addition, the ALJ asked her to assume that the hypothetical individual could lift 50 pounds occasionally and 20 pounds frequently; stand or walk for 6 hours in an 8-hour workday, with the opportunity to alternate sitting and standing every 30 to 60 minutes. The individual could also perform occasional climbing, balancing, stooping, kneeling, crouching, and crawling, but needed to avoid concentrated exposure to environmental and work hazards. The individual could not drive. The individual could understand, remember, and carry out simple instructions consistent with unskilled work. In addition, Ms. Hullender was asked to assume that the individual could tolerate only occasional contact with coworkers and supervisors, and no contact with the general public. Ms.

_____

[6]Ms. Hullender also provided information regarding the Specific Vocational Preparation (SVP) levels of plaintiff's past work.

Hullender opined that such an individual could not perform plaintiff's past relevant work. (Tr. 70-71). The ALJ then asked about the opportunities for the same hypothetical individual limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; and standing, walking, or sitting for 6 hours out of an 8-hour workday. Ms. Hullender testified that such an individual could perform work as a small products assembler, which is classified as light work, and as a final assembler or lens inserter, which are classified as sedentary work. (Tr. 72). These work options would still be available if the person was absent from or left work at unpredictable times at least once a month.

### E.  Medical Records

Plaintiff was first incarcerated for 120 days in the Missouri Department of Corrections (DOC) substance abuse treatment program following his arrest for distribution of a controlled substance. At intake on April 10, 2008, he reported that he had no history of psychiatric treatment, suicide attempts, assaultive behavior, or seizure. He presented a stable mood with appropriate affect. (Tr. 422). His grooming, eye contact and cooperation were all "average or above" and his speech and motor activity were within normal limits. His thought processes were organized and reality-based, and he displayed adequate insight and judgment. There were no signs or symptoms of significant emotional distress or dysfunction. While in custody, plaintiff participated in cognitive-behavioral and anger management groups. (Tr. 422-28).

On August 27, 2009, Eddie W. Runde, M.D., completed a physiatric evaluation of plaintiff's low back pain in connection with his first application for disability benefits. (Tr. 365-67). Plaintiff's medications included Trazadone, Celexa,

Ranitidine, Ibuprofen, and cholesterol and blood pressure medications. Plaintiff reported that, in 1996, he sustained a back injury while working. Three months of physical therapy and three epidural steroid injections did not improve his symptoms and, he underwent two discectomies and a vertebrectomy followed by lumbar fusion in 1997. More than 10 years later, in December 2008 or January 2009, his right leg started to "give out" and he had back problems if he lifted more than 40 pounds. He experienced stiffness, achiness, and tingling in his low back if he sat for too long. He denied having any other numbness, tingling, or weakness. Plaintiff rated his pain at level 7 on a 10-point scale, however, his scores on the McGill Pain questionnaire suggested "an important affective component to his pain perception." On examination, plaintiff was able to dress and undress and get on and off the examination table without assistance. His gait was normal. He had full strength in both legs, with normal sensation and reflexes. Gentle palpation of the lower back elicited tenderness, but no muscle spasms. Dr. Runde diagnosed plaintiff with chronic low back pain and failed back surgery syndrome. He also opined that plaintiff could lift or carry 50 pounds occasionally and 20 pounds frequently, could stand and/or walk 6 hours in an 8-hour day with normal breaks, and could sit with the opportunity to alternate sitting and standing. In addition, Dr. Runde found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Runde opined that plaintiff would be able to sustain a 40-hour work week on a continuous basis with these restrictions.

Licensed psychologist Patrick Finder completed a consultative evaluation on September 1, 2009, also in connection with plaintiff's prior applications for benefits. (Tr. 369-76). Plaintiff reported that he left school and moved out of his parents'

home at age 14. He started using cannabis. Between ages 14 and 18, he worked on a farm. He got married at 17 and worked in his father-in-law's moving business for 3 years. Plaintiff stated that he had "pretty much done nothing ever since" leaving his father-in-law's employ. (Tr. 371). He worked on a cash basis for neighbors and friends, but generally had no steady income, and had been unable to work at all for two years after injuring his back in 1996. Once his condition improved, he did work building cell phone towers, as a handyman, and doing landscape work. He last worked in 2007.

Plaintiff reported that he had not used any drugs since he completed the DOC 120-day treatment program, but he continued to drink alcohol to the point of intoxication. He stated that he had severe racing thoughts throughout his life and drank alcohol to calm down. He used to enjoy working on cars and fishing with his father but he no longer participated in those activities. He stated he did nothing but sit in the yard all day and he walked away when others approached him. (Tr. 372). He described himself as extremely depressed. He was unable to sleep more than three hours a night, even with medication, and was fatigued and tired all the time and had no interest in anything. He expressed hopelessness and helplessness, and expressed a belief that his children would be better off if he were dead. He also reported extreme anxiety, with a long history of racing thoughts, an inability to relax, motor restlessness, gastrointestinal distress, and headaches. He described himself as aggravated, angry, and agitated when he was around people. He had some paranoid ideation, worrying that his wife was unfaithful and that people were talking about him. On mental status examination, plaintiff was grossly oriented, but was uninformed about current events and struggled to solve simple math problems.

He was unable to respond to probes of abstract thinking and had limited recall of digits. Mr. Finder diagnosed plaintiff with major depression, recurrent, severe; generalized anxiety disorder; alcohol abuse; and cannabis dependence in sustained full remission, with a Global Assessment of Functioning (GAF) score of 50.[7] Mr. Finder opined that, given the intensity of plaintiff's depression and anxiety, he did not have "much ability to understand or remember instructions," and had "extremely limited ability" to sustain concentration and persistence and interact socially. However, Mr. Finder also noted that plaintiff was taking only small doses of Celexa and Trazadone and that he had not been seen by a psychiatrist or specialist. He concluded that it was "not known how [plaintiff] would respond to intensive treatment." (Tr. 375).

On September 16, 2009, Stanley Hutson, M.D., completed a Psychiatric Review Technique. (Tr. 382-93). Dr. Hutson concluded that plaintiff met the criteria for affective disorders (major depressive disorder), anxiety-related disorders (generalized anxiety disorder), and substance abuse disorders (alcohol abuse, and drug dependence in remission). Dr. Hutson noted that plaintiff first started taking medication for depression and insomnia in April 2009.

Dr. Hutson also completed a Mental Residual Functional Capacity Assessment. (Tr. 394-96). He found that plaintiff was moderately limited in the abilities to understand, remember, and carry out detailed instructions; maintain

---

[7]**Error! Main Document Only.**The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000). **Error! Main Document Only.**A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." Id. at 34.

attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; work in coordination or proximity to others without being distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the public and coworkers; ask simple questions or request assistance; accept instruction and respond appropriately to criticism; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. Dr. Hutson noted that plaintiff had a history of substantial gainful activity, no prior mental health treatment, and could understand and follow simple instructions and remember work procedures. Noting that plaintiff had done farm labor, Dr. Hutson opined that plaintiff was able to cope in a low-stress work setting. Dr. Hutson found credible plaintiff's allegation that he could not deal with people and opined that plaintiff would benefit from having fairly independent work activity with little contact with others. (Tr. 392, 396).

On September 17, 2009, Q. Michael Ditmore, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. 397-402). Dr. Ditmore agreed with Dr. Runde's assessment of plaintiff's limits and restrictions but disagreed with the diagnosis of "failed back syndrome," citing plaintiff's uncompromised range of motion and lack of neurologic deficits. Dr. Ditmore found plaintiff's allegations of disabling pain were not credible because there was no evidence of ongoing treatment for back problems. In addition, the record contained a report from plaintiff's wife in which she stated that plaintiff mowed the yard and did not identify any significant limitations on his activities.

In January 2010, plaintiff told his primary care physician, Michael Rothermich, M.D., that he had gone to the emergency room for treatment of sudden chest pain, which was attributed to GERD. (Tr. 447). He also complained of several days of abdominal pain. Later that month Donald O. Swayze, D.O., performed an endoscopy and colonoscopy and diagnosed plaintiff with a healed distal esophageal ulcer with small hiatal hernia, mild gastritis, and duodenitis. (Tr. 418). At follow-up on February 2, 2010, Dr. Swayze noted that plaintiff continued to have episodes of severe chest pain. (Tr. 453). A cardiac workup was negative and Dr. Swayze opined that plaintiff's symptoms were suggestive of reflux and esophageal spastic disease. Plaintiff was directed to continue taking a proton pump inhibitor.

On February 10, 2010, Dr. Rothermich noted that plaintiff had pain in his left shoulder with tenderness over the subacromial bursa and reduced range of motion. Although plaintiff was given a steroid injection, he reported that his pain was worsening and Dr. Rothermich prescribed Percocet. (Tr. 444, 445, 446). On February 22, 2010, plaintiff sought emergency treatment for pain in the left side of his neck, jaw and face. (Tr. 402). He also complained of parasthesias in his left arm. On examination, it was noted that plaintiff's neck was bent to the left with some muscle spasm. He did not have any neurologic symptoms. A chest x-ray showed no active disease. (Tr. 420). A CT scan revealed a possible herniated disc at C4-5 and left foraminal stenosis at C5-6 (402, 409). Plaintiff was discharged with prescriptions for Flexeril and Percocet.

Plaintiff was referred to the University of Missouri Health Care Center Orthopaedic Clinic. On March 22, 2010, he reported that he woke up with severe

neck pain that radiated into his left arm and that his pain had worsened over the past month. (Tr. 449-52). He reported that he had weakness in his left hand grip, difficulty holding objects, and headaches. He rated his pain at level 8 on an average day. Moving his head, coughing or sneezing, and lying down all increased his pain. On examination, he had limited range of motion at the neck due to pain and stiffness, but he was able to ambulate without difficulty and had a steady gait. Plaintiff was referred for x-rays and a cervical MRI.

Plaintiff was incarcerated again in April 2010[8] and underwent a mental health evaluation on April 22. (Tr. 428-29). He received elevated scores for depression and psychoticism as measured by the Symptom Checklist 90-R; his IQ was assessed in the average range. (Tr. 430, 433). It was noted that plaintiff had a marijuana and alcohol problem. He reported that he was admitted for a 72-hour evaluation in February 2010 after he said he wished he were dead. At the time of his intake, however, he denied suicidal thoughts and stated that he had children and grandchildren to return to. He had a prescription for Celexa, which he reported kept him calm and even. He displayed a somewhat tearful affect, but his speech and motor activity were within normal limits. He was oriented and there was no evidence of delusions or mania.

On May 6, 2010, DOC psychiatrist Z. A. Ajans completed an intake evaluation. (Tr. 430-31). Plaintiff reported that he had started taking 20 mg Celexa about 7 months earlier but he wanted to stop taking it because he felt "fine." Dr. Ajans noted that plaintiff's ability to make decisions was intact and he had fair insight. It was agreed that plaintiff would decrease his dosage to 10 mg. Dr. Ajans

_____

[8]Plaintiff and his son were arrested for cooking methamphetamine. Plaintiff denied that he was involved. (Tr. 430).

diagnosed plaintiff with adjustment disorder with depression, marijuana dependence, and methamphetamine and alcohol abuse. His highest GAF for the past year was 65; his current GAF was 50. By May 17, 2010, plaintiff had stopped taking Celexa and reported that he was doing well. (Tr. 433-34). His mood was stable and his affect was appropriate. His thought processes were logical and goal-directed. On June 7, 2010, he was described as alert and well-oriented, with a pleasant, calm demeanor, and positive affect. He stated that he was doing well without medications and was remaining active with work, exercise, and school. He was "free of noted impairment" and "willing[] to openly discuss [the] current situation." (Tr. 435). His psychiatric condition appears to have remained stable over the remainder of his 15-month incarceration. With respect to plaintiff's physical health during his incarceration, the record indicates that his back pain was treated with Ibuprofen, and he was assigned to a bottom bunk and restricted from shoveling or mowing. (Tr. 485). In July 2010, he was given a neoprene sleeve and Naproxen to treat tenderness and instability in his right knee. (Tr. 468-69).

Plaintiff was released from the DOC in July 2011. (Tr. 506). On July 27, 2011, plaintiff told Dr. Rothermich that his wife had left him and wanted a divorce. He had not slept much. He also reported that he had severe neck pain. (Tr. 441). Dr. Rothermich prescribed 20 mg. Celexa and Percocet.

About one month after plaintiff was released on parole, he was approached in a bar by a man who told him he was going to take his wife and children away from him. Plaintiff beat the man with a pool ball. (Tr. 581). His parole was violated and he returned to prison until October 2012. The administrative record does not

include evidence of any psychological or medical care plaintiff received during this period of incarceration.

Plaintiff sought mental health treatment upon his release from prison as a condition of his parole. At his initial assessment on October 12, 2012, he presented with anxiety, depression, paranoia, and auditory hallucinations. (Tr. 548-54). His mental status was described as alert, but disheveled and guarded. He was diagnosed with schizophrenia, paranoid type, and polysubstance abuse in remission, with borderline intellectual functioning. Plaintiff's GAF score was assessed as 22.

On October 15, 2012, plaintiff told Dr. Rothermich that he had been to the emergency room with chest pains and shortness of breath. He also had an ulcer on his right leg that had been present for 10 months, despite antibiotic treatment. (Tr. 557). Three days later, plaintiff told cardiologist Larry Handlin, D.O., that he was physically active and tried to walk daily, although he was short of breath. He denied experiencing back pain, joint pain, or limited range of motion. He had no neurological symptoms. On examination, his neck was supple with a good range of motion, and he had a normal gait and station. (Tr. 564-66). An echocardiogram and Doppler analysis on November 1, 2012, was unremarkable. (Tr. 563).

On November 4, 2012, plaintiff presented to the emergency room with complaints of chest pain and seizure.[9] (Tr. 724). He was admitted to the hospital after he had a "staring spell" in the emergency room. (Tr. 739-40). He reported that he had been having such spells since his release from prison three weeks earlier. He was unable to describe the episodes because he had no awareness while

_____

[9]Plaintiff reported that he had consumed a 6-pack of beer the night before his admission. (Tr. 728).

they were occurring. An EEG was normal. (Tr. 761). Plaintiff's chest pain was not cardiac in origin. (Tr. 743-44). At follow-up, cardiologist Dr. Handlin noted that plaintiff's chest pain did not prevent him from performing all activities of daily living.[10] (Tr. 561). Dr. Handlin diagnosed plaintiff with precordial chest pain,[11] supraventricular tachycardia,[12] and hypertension. He recommended that plaintiff "proceed to the catheter lab" once he had Medicaid. (Tr. 562).

On November 7, 2012, psychiatrist Syed Iman, M.D., completed an initial evaluation of plaintiff, whose chief complaint was "I get aggravated being around people." (Tr. 541-47). He reported that he had gone to the emergency room for what he described as a panic attack and had been prescribed valium.[13] He stated that he was isolating himself from his wife and children. He described feeling like people were trying to lock him up again. He reported that he had a lifelong struggle dealing with his anger and a tendency to get belligerent. He suspected that his wife was cheating on him. He had multiple depressive symptoms, including sadness, some suicidal thoughts, loss of interest, guilt, inability to concentrate or remember, and poor sleep and appetite. He had symptoms of anxiety, including feeling jittery and nervous, a racing heart, sweating and a choking feeling. He reported that he drank a lot "in the past" and "did a lot" of methamphetamine and marijuana. On

---

[10]Dr. Handlin notes also state that plaintiff denied any neurological disorders (including seizures, headaches, or loss of consciousness) and psychiatric symptoms (including depression, anxiety, stress or insomnia). (Tr. 561).

[11]**Error! Main Document Only.**The precordium is the region of the anterior surface of the body covering the heart and stomach. See Dorland's Illustrated Med. Dict. 1508 (32nd ed. 2012).

[12]**Error! Main Document Only.**A type of arrhythmia characterized by rapid heart rate and caused by an abnormal source of impulses firing at an abnormally high rate. 5 J.E. Schmidt Attorneys' Dictionary of Medicine, Illustrated S-406 (28th ed. 1995).

[13]The administrative record does not include a medical record documenting this incident.

examination, plaintiff was noted to have a disheveled appearance, and presented as guarded and passive, with low motivation, lack of interest, and hopelessness. However, he was oriented, cooperative, and not in apparent distress. (Tr. 545). His speech was normal and he had no psychomotor abnormalities. His flow of thought was goal directed. He had average intellect and his judgment and insight were intact. Dr. Imam diagnosed plaintiff with generalized anxiety disorder; major depressive disorder, recurrent, moderate; panic disorder with agoraphobia; and polysubstance dependence in remission. His GAF was assessed at 50. (Tr. 543). Dr. Imam increased the dosages of plaintiff's Celexa and Trazadone and added Buspar for anxiety. On January 22, 2013, plaintiff continued to experience anger, depression and anxiety and Dr. Imam further increased plaintiff's Trazadone and Buspar. His GAF remained at 50. (Tr. 533-40).

On November 15, 2012, plaintiff underwent a neurological evaluation of his staring spells. (Tr. 715-18). According to his father, who accompanied him, plaintiff's first episode occurred two years earlier. He described plaintiff as unresponsive and drooling, with his arms raised overhead and jerking rhythmically, while his head shook from side to side. Plaintiff stated that he was having daily episodes which were followed by headache. An EEG showed no correlation with seizures and no focal abnormalities. An MRI of the brain was also unremarkable, as was a second EEG completed on December 11, 2012. (Tr. 707).

On November 16, 2012, plaintiff was seen at the Orthopaedic Clinic for complaints of pain in his shoulder and right arm, which he rated at level 8. (Tr. 618-19). An x-ray and MRI of the cervical spine showed multilevel degenerative changes, most severe at C5-6, where there was a disc osteophyte complex; there

was also severe left foraminal stenosis. (Tr. 614-15). In January 2013, plaintiff had a normal electromyography study (EMG) of the left arm and cervical paraspinal muscles. Nerve conduction studies revealed only mild left carpal tunnel syndrome. (Tr. 704-06). Plaintiff was also diagnosed with mild left cubital syndrome and scapulothoracic bursitis. (Tr. 571-73). On January 11, 2013, plaintiff was given an epidural steroid injection to the cervical spine. (Tr. 700). At follow-up on January 29, 2013, he reported no improvement in his pain, although on examination he had equal and strong bilateral grip strength. (Tr. 568-69). On March 13, 2013, he underwent surgical release procedures of his wrist and elbow. (Tr. 638-41). At follow up on March 27, 2013, he had very little numbness in his hand or pain in his arm. He had some residual pain in his neck and shoulder but was cleared to begin light exercise. (Tr. 683-84).

Plaintiff began psychotherapy with Maria Fliss, Ph.D., on February 27, 2013. (Tr. 580-87). He reported that he had just been served with divorce papers and had ongoing problems with anger, anxiety, and depression. He was attending anger management and substance abuse programs and reported significant improvement in his ability to manage anger. He noted that since leaving prison he had been to the emergency room three times for chest pains, which he thought could be due to panic attacks or seizure activity. Dr. Fliss described plaintiff's mental status as agitated, alert, guarded, and disheveled, with anxious and depressed mood, anxious affect, and agitated motor activity. He made fair eye contact and his flow of thought was tangential. He had poor insight and judgment. She diagnosed plaintiff with major depressive disorder, recurrent, moderate; panic disorder without

agoraphobia; generalized anxiety disorder; and polysubstance dependence. She assigned a GAF of 50.

On March 4, 2013, plaintiff was transported to the emergency room with seizure activity and pain in his left arm and chest. (Tr. 650). He reported that he had a prescription for Gabapentin but had not taken it for two days. (Tr. 659). He was discharged with diagnoses of seizure, chest wall pain, and hypoglycemia. (Tr. 648-49). He was directed to take his medications as prescribed and follow up with a neurologist. (Tr. 651).

On April 3, 2013 Dr. Imam completed a medical source statement. (Tr. 768-69). He opined that plaintiff was extremely limited in his abilities to carry out detailed instructions; adhere to a work schedule; complete a normal workday and workweek without interruption from psychologically-based symptoms; accept instruction; and work with others. He further opined that plaintiff was markedly limited in his abilities to remember locations and work-like procedures; understand and remember detailed instructions; maintain attention and concentration for extended periods; sustain ordinary routine without special supervision; interact with the public; ask simple questions or request assistance; maintain socially appropriate behavior; respond to changes in the work setting; take appropriate precautions against hazards; travel to unfamiliar places; and set realistic goals. He was moderately limited with respect to his abilities to understand, remember, and carry out short and simple instructions, and make simple decisions.

### III. The ALJ's Decision

In the decision issued on April 25, 2013, the ALJ made the following findings:

1.      Plaintiff met the insured status requirements of the Social Security Act through June 30, 2010.

2.     Plaintiff has not engaged in substantial gainful activity since December 1, 2008, the alleged onset date.

3.     Plaintiff has the following severe impairments: disc protrusion at C4-5 and left foraminal stenosis at C5-6; history of lumbar discectomies and fusion; and adjustment disorder with depression.

4.     Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.     Plaintiff has the residual functional capacity to perform light work except that he needs to alternate sitting and standing every 30 to 60 minutes. He can occasionally climb balance, stoop, kneel, crouch, and crawl, and must avoid concentrated exposure to hazards. He can do no work where driving is a job function. He can understand, remember, and carry out at simple instructions consistent with unskilled work. He can tolerate minimal superficial contact with co-workers and supervisors, but can have no contact with the public.

6.     Plaintiff is unable to perform any past relevant work.

7.     Plaintiff was 42 years old on the alleged onset date and 46 years old at the time of the hearing and thus is a younger individual.

8.     Plaintiff has a high school education and is able to communicate in English.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocation Rules as a framework supports a finding that plaintiff is not disabled, whether or not he has transferrable job skills.

10.    Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform, such as small production assembler, final assembler, and lens inserter.

11.    Plaintiff has not been under a disability within the meaning of the Social Security Act from December 1, 2008, through the date of the decision.

(Tr. 10-26).

## IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." <u>Long v. Chater</u>, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002) (<u>quoting Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. § 404.1520; <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at

942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity (>RFC=), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that

these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ's determinations of his physical and mental residual functional capacity are not supported by medical evidence.[14]

## A.  **Physical RFC Assessment**

Plaintiff asserts that the ALJ erred by giving significant weight to the 2009 opinions of Dr. Runde and Dr. Ditmore in determining that he retained the capacity to perform light work.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

In August 2009, Dr. Runde performed a consultative examination of petitioner and determined that he was capable of work at the medium exertion level. In September 2009, Dr. Ditmore, a State agency medical consultant,

---

[14]In assessing plaintiff's RFC, the ALJ addressed plaintiff's credibility and determined that his statements concerning the intensity, persistence and limiting effects of his symptoms were only partially credible. (Tr. 18). Plaintiff does not challenge this finding and the Court finds that the ALJ's thorough credibility analysis properly addresses the required factors.

concurred in Dr. Runde's assessment of plaintiff's functional limitations. The ALJ gave significant weight to their opinions, but reduced plaintiff's exertional level to light work to account for later-acquired evidence. (Tr. 22).

Plaintiff asserts that the ALJ's should not have relied on the opinions of Drs. Runde and Ditmore because they did not have access to the later-developed evidence of degenerative disc disease in his cervical spine. To the extent that plaintiff suggests that the 2009 reports were stale, that argument fails. To be entitled to disability benefits under Title II, plaintiff has the burden to show that he was disabled between December 1, 2008, his alleged date of onset, and before the expiration of his insured status on June 30, 2010.[15] Moore v. Astrue, 572 F.3d 520, 522 (8th Cir. 2009). The 2009 reports are within the relevant period and the ALJ did not err in relying on them.

More significantly, the ALJ found that the record did not support plaintiff's claims of disabling impairments arising from his neck condition. Plaintiff first complained of neck pain in February 2010. That same month, diagnostic scans revealed likely disc protrusion and stenosis in the cervical spine. Plaintiff was referred for an MRI but returned to prison before that was accomplished. Records of plaintiff's care while in custody do not support his claim of disabling impairments. While he sought treatment for back and knee pain, there is no indication that he complained of neck pain. Furthermore, his restrictions from mowing and shoveling are not consistent with disabling impairment. Similarly, in May 2010, plaintiff reported that he was "remaining active with work, exercise and school," and

---

[15]To be entitled to supplemental security income Title XVI, he must show he was disabled while his application was pending, or between August 3, 2011 and April 25, 2013. Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990).

physical and neurological examinations in July 2010 were within normal limits. (Tr. 345, 465-66). Although there are no records of his medical care during his third incarceration, shortly after his release in October 2012, plaintiff reported that he was physically active and tried to walk every day, and he had full range of motion in his neck. (Tr. 564-66). In November and December 2012, x-rays and an MRI disclosed significant degenerative disc disease in plaintiff's cervical spine. However, an EMG was normal and nerve conduction studies revealed only mild carpal tunnel syndrome. After carpal and cubital release surgery in March 2013, plaintiff showed significant improvement and was cleared to begin light exercise. The ALJ's decision that plaintiff's neck condition did not cause disabling symptoms is supported by substantial evidence in the record as a whole.

For the reasons stated above, the ALJ did not err in relying on the opinions of Drs. Runde and Ditmore in assessing plaintiff's physical RFC. Accordingly, the court rejects plaintiff's argument that the ALJ failed to identify medical evidence in support of the RFC. Finally, the court finds that substantial evidence in the record as a whole supports the ALJ's determination that plaintiff had the RFC to perform light work.

### B.    Mental RFC Assessment

The ALJ found that plaintiff had the mental RFC to perform simple work with minimal contact with co-workers and supervisors and no contact with the general public. In reaching this conclusion, the ALJ gave great weight to the 2009 opinion of Dr. Hutson, the State agency psychological consultant. Plaintiff argues that the ALJ erred by failing to give greater weight to the 2009 opinion of consultative examiner Mr. Finder and the 2013 opinion of treating psychiatrist Dr. Imam.

Mr. Finder opined that, given the intensity of plaintiff's depression and anxiety, he did not have much ability to understand and remember instructions and was extremely limited in his abilities to sustain concentration and persistence and interact socially. (Tr. 375). However, he qualified his opinion by noting that plaintiff was taking only small doses of psychotropic medications and had never been treated by a psychiatrist or other specialist. He also stated that it was not known how plaintiff would respond to intensive treatment. The ALJ discounted Mr. Finder's opinion, noting that plaintiff had begun mental health treatment and should show improvement so long as he refrained from substance use. The court finds that the ALJ did not err in discounting Dr. Finder's opinion.

In 2013, Dr. Imam opined that plaintiff was severely limited in a number of work-related capacities. The ALJ gave this opinion little weight. (Tr. 22). The opinion of a treating physician is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). A treating physician's opinion does not automatically control, however, because the record must be evaluated as a whole. Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (internal quotations and citations omitted). Furthermore, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight." Soc. Sec. Ruling 96–5p, 1996 WL 374183, at *2 (July 2, 1996). Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating

physician's evaluation. <u>Prosch</u>, 201 F.3d at 1013 (<u>quoting</u> 20 C.F.R §
404.1527(d)(2)).

When deciding "how much weight to give a treating physician's opinion, an
ALJ must also consider the length of the treatment relationship and the frequency
of examinations." <u>Brown v. Astrue</u>, 611 F.3d 941, 951 (8th Cir. 2010) (<u>quoting</u>
<u>Casey v. Astrue</u>, 503 F.3d 687, 692 (8th Cir. 2007)). Here, the ALJ noted that Dr.
Imam had seen plaintiff only twice at the time he formulated his opinion. The ALJ
also found that the severity of the limitations imposed by Dr. Imam were
inconsistent his assessment that plaintiff's GAF was 50. (<u>See</u> Tr. 22) (noting that
GAF of 50 indicates severe symptoms but is a borderline score, since 51 indicates
moderate symptoms). Furthermore, at the time Dr. Imam made his findings,
plaintiff had had only one session of psychotherapy with Dr. Fliss, who noted that
plaintiff was making an effort to attend AA, substance abuse treatment, and anger
management sessions. Plaintiff's self-report suggests some improvement in his
functioning. The ALJ also noted that, during his incarceration in 2010, plaintiff
reported that he was doing well even after he stopped taking antidepressant
medications. The court finds that the ALJ did not err in giving Dr. Imam's opinion
little weight.

Plaintiff cites <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 944 (8th Cir. 2009), to
argue that his GAF scores suggest greater limitations on his mental RFC. In <u>Pate-</u>
<u>Fires</u>, the record included 21 GAF scores over a period of 6 years, only 4 of which
were above 50. The Eighth Circuit found that the ALJ erred by failing to consider the
scores below 50. Here, plaintiff was assessed the following scores: current GAF of
50 assessed in 2009; past year GAF of 65 and current GAF of 50 assessed in 2010;

current GAF of 22 assessed in October 2012; and current GAF of 50 assessed in November 2012, January 2013, and February 2013. Unlike in Pate-Fires, the ALJ considered all of the GAF scores. She excluded the GAF of 22 as inconsistent with the record because one month later Dr. Imam assessed plaintiff's GAF as 50. The ALJ also noted that, while a GAF of 50 indicates serious symptoms, it is a "borderline" score. Pate-Fires is inapplicable because the ALJ considered all the GAF scores. Finally, the ALJ accounted for plaintiff's mental impairments by restricting him to simple work and minimal contact with others.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 4th day of August, 2015.